Hal D. Cunningham (Bar No. 243048)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 223-4565
Facsimile: (619) 233-0508
hcunningham@scott-scott.com

Christian Levis (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com

*[additional counsel listed on signature page]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC.<br><br>Defendant. | Case No.: _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jane Doe ("Plaintiff"), on behalf of herself and all others similarly situated, asserts the following against Defendant Google LLC ("Google") based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## SUMMARY OF ALLEGATIONS

1.      Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars.

2.      One of Google's most lucrative businesses is its advertising and analytics services, which alone generates hundreds of billions of dollars in advertising revenue for Google every year.

3.      In connection with these services, Google makes a number of tracking tools, including Google's software development kits, tracking pixel, cookies, and other tracking technology, including Google Analytics (collectively Google's "Tracking Technology"), which are

1    used to collect data from the websites and mobile applications in which they are integrated.

2         4.      Google's Tracking Technology is incorporated into third party websites through a

3    small piece of JavaScript code embedded on each page of the site. The code intercepts a user's

4    interactions, including any information they input and what they click, as they navigate each page

5    and sends that information, along with identifiable information, to Google for processing. Google

6    uses this data to provide marketing and analytics services as well as improve its ad targeting

7    capabilities and data points on users.

8         5.      Alarmingly, Google's Tracking Technology is or was incorporated on the vast

9    majority of healthcare provider websites, including those of major institutions such as Planned

10   Parenthood, Keck Medicine of USC, MemorialCare: Long Beach Medical Center, and Sharp

11   HealthCare, and specifically on pages where patients can book appointments and access sensitive

12   health information.

13        6.      For example, the Planned Parenthood website, www.plannedparenthood.org,

14   allows users to search for and schedule appointments for health care services (such as an abortion,

15   birth control, etc.) and prompts users to enter their zip code, city, or state, whether they are seeking

16   an in-person or telehealth appointment, and even at times to enter sensitive health information such

17   as the first day of their last period.

18        7.      As users navigate the healthcare provider websites, Google's Tracking Technology

19   collects their sensitive information, including health information relating to sensitive medical

20   appointments, medical conditions, specific treatments, messages to healthcare providers, and

21   personally identifiable information ("PII").

22        8.      Plaintiff used the Planned Parenthood website, which incorporated Google's

23   Tracking Technology, to search for an appointment for an abortion, selecting a facility in Burbank,

24   California.

25        9.      Plaintiff, like other Class members, expected their private, personal sensitive

26   information (e.g., their searches, inputs, health information related to sensitive medical

27   appointments, medical conditions, specific treatments, messages to healthcare providers, and PII)

28

1    conveyed through healthcare provider websites to remain confidential.

2        10.      However, unbeknownst to Plaintiff and Class members, Google intercepted and

3    collected their sensitive information, including their searches, inputs, health information relating to

4    private, personal, sensitive medical appointments, medical conditions, specific treatments, messages

5    to healthcare providers, and PII without consent.

6        11.      Google's unlawful interception of Plaintiff's and Class members' communications

7    with healthcare provider websites constitutes an extreme invasion of privacy and violates federal

8    and state statutory and common law. Given the secret and undisclosed nature of Google's conduct,

9    additional evidence supporting Plaintiff's claims, including the full extent of how Google

10   intercepted Plaintiff's and Class members' private communications, and how they used that

11   information, will be revealed in discovery.

12                                      **PARTIES**

13       12.      **Plaintiff Jane Doe** is a natural person and resident of Los Angeles County,

14   California.

15       13.      Plaintiff used the Planned Parenthood website in 2018 to search for an abortion

16   provider through Planned Parenthood's scheduling pages.

17       14.      Plaintiff clicked on a Planned Parenthood affiliate in Burbank, California on the

18   Planned Parenthood website.

19       15.      Plaintiff then received treatment at this Planned Parenthood affiliate in Burbank,

20   California.

21       16.      Plaintiff's private communications to Planned Parenthood, including her sensitive

22   information like being pregnant and searching for an abortion, were intercepted by Google through

23   Google's Tracking Technology incorporation on Planned Parenthood's website.

24       17.      Plaintiff did not consent to Google's interception of her private, personal

25   information nor was Plaintiff provided notice of Google's interception and Plaintiff did not have the

26   opportunity to opt out of Google's interception.

27       18.      Google used this information to, at least, provide marketing and analytics services

28

and to improve its software, algorithms, and other technology. Upon information and belief, this information was also used by Google's advertising offerings to create customer profiles, custom audiences, and serve targeted advertisements.

19.      **Defendant Google LLC** is a Delaware limited liability company with its principal place of business located in Mountain View, California 94043.

20.      Google, as the creator of its Tracking Technology and an established advertising company, knew that it intercepted each of a user's interactions on the website or mobile application that incorporated this technology.

21.      Accordingly, Google at all times knew that the incorporation of its Tracking Technology into healthcare provider websites would result in its interception of sensitive information, including health information relating to the scheduling of sensitive medical appointments (for example, abortions), medical conditions, specific treatments, messages to healthcare providers, and PII.

22.      Indeed, this is not the first or last time Google has been called out for collecting sensitive data like health information. For example, back in November 2019 the *Financial Times* uncovered that Google received prescription drug names input by users on the website drugs.com. In response to the report, Google claimed it had subsequently "marked" the data as sensitive internally, excluding it from personalized ads, but that its technology may still serve "contextual" ads from the content the user viewed.

23.      Despite this, Google still took no action to prevent its Tracking Technology from being embedded on healthcare provider websites from which it received sensitive health information including their searches, inputs, health information relating to sensitive medical appointments, medical conditions, specific treatments, messages to healthcare providers, and PII.

24.      This is because Google does not want to stop collecting the data. Indeed, following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, several Google employees requested an internal forum that "management . . . reconsider its data-sharing and collection processes." This request was ignored. Parul Koul, a Google software engineer, explained

CLASS ACTION COMPLAINT JURY TRIAL DEMANDED
CASE NO. _____

that "users are concerned about, in light of this ruling, that Google will pass information on their searches, communications, and location history to law enforcement and that this data will be used to criminalize those seeking abortions." He explained, "Google has completely failed to address this concern." Currently, Mr. Koul and the Alphabet Workers Union are "demand[ing] that Google refuse to store any data that could be used to prosecute users in the U.S. [from] exercising their bodily autonomy."[1]

25.     As demonstrated by the incorporation of Google's Tracking Technology on healthcare provider websites, Google did not take any steps to prevent its interception and use of users' sensitive health data—including their searches, inputs, health information relating to sensitive medical appointments, medical conditions, specific treatments, messages to healthcare providers, and PII.

26.     As such, Google's conduct was intentional despite knowing the privacy violations it caused to Plaintiff and Class members.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative members of the Classes defined below, and a significant portion of putative Class members are citizens of a state different from that of the Defendant.

28.     This Court has personal jurisdiction over Google because its principal place of business is in California. Additionally, Google is subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in this State, including Google's collection of Plaintiff's and Class members' sensitive data from healthcare provider websites and use of that data for commercial purposes.

---

[1]     Gerrit De Vynck, *Abortion is illegal for millions. Will Big Tech help prosecute it?*, WASHINGTON POST (June 29 2022), https://www.washingtonpost.com/technology/2022/06/29/google-facebook-abortion-data/

29.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (c), and (d) because a substantial portion of the conduct described in this Class Action Complaint was carried out in this District.  Furthermore, Google is headquartered and resides in this District.

30.     **Divisional Assignment:** This action arises in Santa Clara County, in that a substantial part of the events which give rise to the claims asserted herein occurred in Santa Clara County. Pursuant to L.R. 3-2(e), all civil actions that arise in Santa Clara County shall be assigned to the San Jose Division.

## FACTUAL BACKGROUND

### I.   Google's Tracking Technology

31.     Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

32.     Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[2] In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenue from advertising in prior years:

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|---------------|------------|--------------|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

33.     Google offers several analytics products, including its Tracking Technology, which exists solely to help drive ad revenue. For instance, Google Tracking Technology integrates with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing

---

[2]     ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

Google's overall ad revenue. Products like Google's Tracking Technology also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

34.     Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

35.     Google continued updating its analytics platform, launching Universal Analytics in 2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

36.     In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

37.     Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion dollar increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

38.     Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[3] It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly

---

[3]     *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 10, 2023).

1    analyze your data and collaborate with an easy-to-use interface and shareable reports."[4]

2       39.      Google's Tracking Technology is incorporated into third party websites by adding

3    a small piece of JavaScript measurement code to each page on the site. This code immediately

4    intercepts a user's interaction with the webpage every time the user visits it, including what pages

5    they visit and what they click on. The code also collects identifiable information, such as the IP

6    address and Client ID.

7       40.      Once Google's Tracking Technology collects the data, it packages the information

8    and sends it to Google for processing in the Google Analytics platform. The Google Analytics

9    platform also allows the company or advertiser to customize the processing of the data, such as

10    applying filters. Once the data is processed, it is stored on a Google database and cannot be changed.

11       41.      After the data has been processed and stored in the database, Google uses this data

12    to generate reports to help analyze the data from the webpages. These include reports on acquisition

13    (e.g., information about where your traffic originates, the methods by which users arrive at your site

14    or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user

15    engagement by the events and conversion events that users trigger and the web pages and app

16    screens that user visits), and demographics (e.g., classify your users by age, location, language, and

17    gender, along with interests they express through their online browsing and purchase activities).

18       42.      In addition to using the data collected through its Tracking Technology to provide

19    marketing and analytics services, Google also uses the data to improve its ad targeting capabilities

20    and data points on users.

21    **II.    Google's Tracking Technology on Healthcare Provider Websites**

22       43.      The implementation of Google's Tracking Technology on healthcare provider

23    websites provides Google with a treasure trove of private, personal, highly sensitive and valuable

24    information regarding Plaintiff's and Class members' medical conditions, treatments, and

25    appointments.

26

27    _____

     [4]      *Id.*

28

CLASS ACTION COMPLAINT JURY TRIAL DEMANDED
CASE NO. _____

44.     For example, through Google's Tracking Technology incorporated on the Planned Parenthood website, Google intercepted users' interactions, including private, sensitive health information such as whether the user is pregnant or scheduling an abortion. As a result, the information Plaintiff provided, clicked, and searched for on the Planned Parenthood website to locate an abortion provider was intercepted by Google in violation of state, federal, and common law.

45.     An investigation by *Lockdown Privacy* confirmed the same, revealing that Google Tracking Technology intercepted private, personal information regarding the user's interaction with the Planned Parenthood website, including its scheduling pages. Google's Tracking Technology intercepts, at a minimum, the user's IP address, the site visited, behavior on the site, reason for visiting the site (e.g., "abortion"), the user's selected method of abortion (e.g., surgical abortion/in-clinic), the browser time zone, the name of the Planned Parenthood Health Center for the appointment, the user's approximate zip code, the user's closest Planned Parenthood affiliate based on their zip code, a time stamp, whether the user came from a search engine, a link, or typed the URL directly, the user's Client ID, and the browser language.

46.     Other independent testing also reveals Google's interception of users' interactions on the Planned Parenthood website. Using *The Markup*'s "Blacklight" tool confirms that Google's Tracking Technology is incorporated on Planned Parenthood's scheduling pages. The Blacklight tool works by visiting a website with a headless browser and running custom software in the background of the webpage that monitors scripts and network connections. It then logs which scripts call certain functions and generates a report. Specifically, the software was run by visiting Planned Parenthood's homepage, as well as its scheduling page to "Find a Health Center."

47.     The results showed Google's Tracking Technology was incorporated on the "Find a Health Center" page and "Abortion Clinics Near You" page and that, consequently, Google received information about users' activity on the page, including what they searched or sought treatment for. Additionally, the results reveal that Google's Tracking Technology likely had enabled its "remarketing audiences," which allows a user to be tracked across the internet. Lastly, Google's

CLASS ACTION COMPLAINT JURY TRIAL DEMANDED
CASE NO. _____

parent company, Alphabet, Inc., embedded third party cookies. Third party cookies are set by the third party (here, Alphabet, Inc.) by embedding JavaScript into the website that allows the user to be tracked across multiple websites.

48.     But Planned Parenthood is not the only healthcare provider website that incorporates Google's Tracking Technology. Indeed, the vast majority do, including major hospitals and medical centers like Keck Medicine of USC, MemorialCare: Long Beach Medical Center, and Sharp HealthCare, for example.

49.     Analyzing these websites using the Blacklight tool has also confirmed Google's interception of users' interactions through the incorporation of Google's Tracking Technology, including on the appointment scheduling page of Keck Medicine of USC, MemorialCare: Long Beach Medical Center, and patient portals, such as Sharp HealthCare. Plaintiff expects discovery to reveal a complete list of websites using or that have used Google's Tracking Technology and the data Google intercepted from those sites, which is information exclusively in its control.

50.     Plaintiff and Class members did not consent to the interception of their data by Google. Google's interception of Plaintiff's and Class members' private, personally sensitive information, including their searches, inputs, health information relating to sensitive medical appointments, medical conditions, specific treatments, messages to healthcare providers, and PII, without their consent, is an invasion of privacy and violates several laws, including the California Confidentiality of Medical Information Act ("CMIA") and the California Invasion of Privacy Act ("CIPA").

**III.     Plaintiff and Class Members Do Not Consent to Google's Interception of Their Sensitive Information**

51.     Plaintiff and Class members had no way of knowing Google intercepted their sensitive information, including, for example, when searching for and scheduling appointments through healthcare providers' scheduling pages, and when using patient portals to schedule appointments, access information about their medical treatments, and contact their medical provider, because Google's software is seamlessly incorporated in the background.

52.     Thus, Plaintiff and all Class members could not consent to Google's conduct when they were unaware their confidential communications would be intercepted, stored, and used in the first place.

**IV.     Plaintiff and Class Members Have a Reasonable Expectation of Privacy in Their User Data**

53.     Plaintiff and Class members have a reasonable expectation of privacy in their confidential communications, including information relating to their searches for and scheduling of abortions and other medical services, and their sensitive medical information.

54.     Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

55.     For example, a recent study by *Consumer Reports* shows that 92% of Americans believe that websites should be required to provide consumers with a complete list of the data that has been collected about them. Moreover, according to a study by *Pew Research Center*, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.

56.     Users act consistent with these preferences. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data when prompted. Another recent study by *DataGrail* revealed that 67% of people were willing to pay $100 or more annually to keep their information out of the hands of companies and the government. The same study revealed that 75% of people would abandon brands that do not take care of their data.

57.     The expectation of privacy in this specific type of data is especially heightened in light of the recent Supreme Court decision in *Dobbs v. Jackson Women's Health Organization*, overturning the constitutional right to abortion, with many states banning abortion all together. Indeed, 66% of younger women are making privacy-related changes, deleting, or are planning to delete period tracker apps on their devices as *Roe v. Wade* is now overturned.  Google's conduct is

particularly intrusive and offensive in light of this decision, as this type of highly sensitive information can potentially be turned over in response to a criminal subpoena.

58.     Google's surreptitious interception, storage, and use Plaintiff's and Class members' sensitive information, including health information relating to sensitive medical appointments, medical conditions, and medical treatments violates Plaintiff's and Class members' privacy interests.

## V.     The Data Google Intercepted is Plaintiff's Property, Has Economic Value, and its Interception Caused Economic Harm

59.     It is common knowledge in the industry that there is an economic market for consumers' personal data—including the data Google intercepted from Plaintiff and Class members.

60.     In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, age, gender, and location information sold for $.50 per 1,000 people. This estimate was based upon industry pricing data viewed by the *Financial Times* at the time.

61.     In 2015, *TechCrunch* reported that to obtain names of individuals who have particular diseases, a market participant would need to spend $.30 per name. That same article explained that a single user's data can vary from $15 to $40.

62.     Notably, a 2021 report from *Invisibly* found that personal medical information is one of the ***most valuable pieces of data*** within this data-market. "It's worth acknowledging that because health care records often feature a more complete collection of the patient's identity, background, and personal identifying information (PII), health care records have proven to be of particular value to criminals."[5] "While a single social security number might go for $0.53, a complete health care record sells for $250 on average. For criminals, the more complete a dataset, the more potential value they can get out of it. As a result, health care breaches increased by 55%

---

[5]     *How Much is Your Data Worth? The Complete Breakdown for 2021*, INVISIBLY, (July 13, 2021), https://www.invisibly.com/learn-blog/how-much-is-data-worth/.

in 2020."[6] The article noted the following breakdown in average price for record type:

| Record Type | Average Price |
|---|---|
| Health Care Record | $250.15 |
| Payment Card Details | $5.40 |
| Banking Records | $4.12 |
| Access Credentials | $0.95 |
| Social Security Number | $0.53 |
| Credit Record | $0.31 |
| Basic PII | $0.03 |

63.     The Federal Trade Commission has also confirmed the value of user data and, particularly, health information. It found back in 2014 that data brokers sell data that categorize users into sensitive categories, such as "expectant parent."[7] It recently sued one of these companies for selling location data on people who visit abortion clinics for approximately $160 for a week's worth of data. Experian also refers to health data as a "gold mine" for healthcare companies and clinicians.

64.     For instance, Datarade.ai advertises access to U.S. customers names, addresses, email addresses, and the telephone numbers of people who bought brand name medicine. Even only some of this data may sell for $10,000. Other companies, like Pfizer, spend $12 million annually to purchase health data.  This is not surprising given that the medical data industry was valued at over $2.6 billion back in 2014.

---

[6]     *Id.*

[7]     DATA BROKERS, A CALL FOR TRANSPARENCY AND ACCOUNTABILITY, FEDERAL TRADE COMMISSION, (May 2014), available at https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf.

65.     Furthermore, individuals can sell or monetize their own data if they so choose. A myriad of other companies and apps such as Nielsen Data, Killi, DataCoup, and AppOptix offer consumers money in exchange for their personal data.

66.     Google itself also values this data. As Laura Lazaro Cabrera, a legal officer at Privacy International, indicated, access to use even only some of the data points Google collected—such as just the URL—is problematic. She explained, "Think about what you can learn from a URL that says something about scheduling an abortion . . . [analytics companies] [are] in the business of developing algorithms. They know what sorts of information can act as a proxy for personal data."

67.     Given the monetary value ***already*** assigned to personal information, Google has deprived Plaintiff and Class members of the economic value of their sensitive medical information by acquiring such data without providing proper consideration for Plaintiff's and Class members' property.

## CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) individually and on behalf of the following Classes of persons:

> **Nationwide Class**: All natural persons in the United States and its territories whose health information or other sensitive data was intercepted by, or disclosed to, Google through Google's Tracking Technology on health-based apps or websites.

> **California Subclass**: All natural persons residing in California whose health information or other sensitive data was intercepted by, or disclosed to, Google through Google's Tracking Technology on health-based apps or websites.

69.     Excluded from the Classes are: (1) the Defendant, Defendant's subsidiaries, affiliates, and employees; (2) all persons who make a timely election to be excluded from the Classes; (3) Plaintiff's counsel and Defendant's counsel and members of their immediate families; (4) government entities; and (5) any judge to whom this case is assigned, including his/her immediate family and court staff.

70.     Certification of Plaintiff's claims for class-wide treatment is appropriate because all elements of Fed. R. Civ. P. 23(a) and (b)(2)-(3) are satisfied. Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in

1    individual actions alleging the same claims.

2        71.    **Numerosity:** All requirements of Fed. R. Civ. P. 23(a)(1) are satisfied. The

3    members of the Classes are so numerous and geographically dispersed that individual joinder of all

4    Class members is impracticable. While Plaintiff is informed and believes that there are likely tens

5    of thousands, if not millions, of members of the Classes, the precise number of Class members is

6    unknown to Plaintiff. Class members may be identified through objective means, including

7    Defendant's own records. Class members may be notified of the pendency of this action by

8    recognized, court-approved notice dissemination methods, which may include U.S. mail, electronic

9    mail, internet postings, and/or published notice.

10        72.    **Commonality and Predominance:** All requirements of Fed. R. Civ. P. 23(a)(2)

11   and 23(b)(3) are satisfied. This action involves common questions of law and fact, which

12   predominate over any questions affecting individual Class members, including, without limitation:

13       a.  Whether Google's acts and practices violated the California Invasion of Privacy Act, Cal.
             Penal Code §§ 630, *et seq.*;
14

15       b.  Whether Google's acts and practices violated Plaintiff's and Class members' privacy rights;
16

17       c.  Whether Google's acts and practices violated California Constitution, Art. 1, § 1;

         d.  Whether Google's acts and practices violated California's Confidentiality of Medical
18           Information Act, Civil Code §§ 56, *et seq.*;

19       e.  Whether Google was unjustly enriched;

20       f.  Whether Plaintiff and the Class members are entitled to equitable relief, including but not
21           limited to, injunctive relief, restitution, and disgorgement; and

22       g.  Whether Plaintiff and the Class members are entitled to actual, statutory, punitive or other
             forms of damages, and other monetary relief.

23        73.    **Typicality**: Plaintiff's claims are typical of the claims of the other members of the

24   Classes.  The claims of Plaintiff and the members of the Classes arise from the same conduct by

25   Defendant and is based on the same legal theories.

26        74.    **Adequate Representation:** Plaintiff has and will continue to fairly and adequately

27   represent and protect the interests of the Classes. Plaintiff has retained counsel competent and

28

1    experienced in complex litigation and class actions, including litigations to remedy privacy

2    violations.  Plaintiff has no interest that is antagonistic to the interests of the Classes, and Defendant

3    has no defenses unique to any Plaintiff. Plaintiff and her counsel are committed to vigorously

4    prosecuting this action on behalf of the members of the Classes, and they have the resources to do

5    so. Neither Plaintiff nor her counsel have any interest adverse to the interests of the other members

6    of the Classes.

7         75.    **Substantial Benefits:** This class action is appropriate for certification because class

8    proceedings are superior to other available methods for the fair and efficient adjudication of this

9    controversy and joinder of all members of the Classes is impracticable.  This proposed class action

10   presents fewer management difficulties than individual litigation, and provides the benefits of single

11   adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment

12   will create economies of time, effort, and expense and promote uniform decision-making. Plaintiff

13   reserves the right to revise the foregoing class allegations and definitions based on facts learned and

14   legal developments following additional investigation, discovery, or otherwise.

15              **CALIFORNIA LAW APPLIES TO BOTH CLASSES**

16        76.    California substantive laws apply to every member of the Classes. California's

17   substantive laws may be constitutionally applied to the claims of Plaintiff and the Classes under the

18   Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV. § 1 of the U.S.

19   Constitution. California has significant contact, or significant aggregation of contacts, to the claims

20   asserted by Plaintiff and Class members, thereby creating state interests to ensure that the choice of

21   California state law is not arbitrary or unfair.

22        77.    Google maintains its principal places of business in California and conducts

23   substantial business in California, such that California has an interest in regulating Google's conduct

24   under its laws. Google also selected California law as the law to govern all disputes with its

25   customers in its Terms of Service. Google's decision to reside in California and avail itself of

26   California's laws, renders the application of California law to the claims herein constitutionally

27   permissible.

28

78.    The application of California laws to the Classes is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiff and the proposed Classes, and California has a greater interest in applying its laws here given Google's location and the location of the conduct at issue than any other interested state.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

79.    The applicable statutes of limitation have been tolled as a result of Google's knowing and active concealment and denial of the facts alleged herein.

80.    Google secretly incorporated Google's Tracking Technology into healthcare provider websites providing no indication to users that Google intercepted their sensitive information.

81.    Google had exclusive knowledge that these websites incorporated its software, yet failed to disclose that fact to users, or that by interacting with these websites their sensitive information would be intercepted by Google.

82.    Plaintiff and Class members could not with due diligence have discovered the full scope of Google's conduct, including because it is highly technical and there were no disclosures or other indication that would inform a reasonable consumer that a third party was intercepting data from these websites.

83.    The earliest Plaintiff and Class members could have known about Google's conduct was shortly before the filing of this Complaint.

84.    Google was under a duty to disclose the nature and significance of their data collection practices but did not do so.  Google is therefore estopped from relying on any statute of limitations under the discovery rule.

85.    Additionally, Google engaged in fraudulent conduct to prevent Plaintiff and Class members from discovering the interception of their data. Plaintiff and Class members were misled to believe their data, including health information relating to their appointments and sensitive medical information, would not be intercepted. Google did not disclose this information and

healthcare provider websites expressly represented this information would remain anonymous and confidential.

86.     Plaintiff and Class members were not aware that Google intercepted their data, including their sensitive information.

87.     Plaintiff and Class members exercised due diligence to uncover the facts alleged herein and did not have actual or constructive knowledge of Google's misconduct by virtue of their fraudulent concealment.

88.     Accordingly, all statutes of limitations are tolled under the doctrine of fraudulent concealment.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of Plaintiff and the Class and Subclass)**

89.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

90.     A Plaintiff asserting claims for intrusion upon seclusion must plead (1) that the defendant intentionally intruded into a matter as to which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

91.     Google's surreptitious interception, storage, and use of Plaintiff's and Class members' interactions and communications with healthcare provider websites, such as Planned Parenthood's website, including health information pertaining to a user's reproductive health and seeking of medical treatment, constitutes an intentional intrusion upon Plaintiff's and Class members' solitude or seclusion.

92.     Plaintiff and Class members had a reasonable expectation of privacy in this information. Plaintiff's private communications with the healthcare providers through their websites and patient portals are inherently sensitive in nature, especially those relating to booking appointments. Plaintiff and Class members reasonably expected this information would remain private and confidential and would not be intercepted by a third party without their consent.

93.     Plaintiff and Class members did not consent to, authorize, or know about Google's intrusion at the time it occurred. Plaintiff and Class members never agreed that Google could intercept their user data, including sensitive information.

94.     The surreptitious taking and interception of sensitive user data from thousands, if not millions of individuals, was highly offensive (and would be to a reasonable person) because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

95.     The offensiveness of this conduct is all the more apparent because Google's interception, storage, and use of this sensitive information was conducted inconspicuously in a manner that Plaintiff and Class members would be unable to detect. As a result of Google's actions, Plaintiff and Class members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

96.     Plaintiff and Class members have been damaged as a direct and proximate result of Google's invasion of their privacy and are entitled to just compensation, including monetary damages.

97.     Plaintiff and Class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Google as a result of its intrusions upon Plaintiff's and Class members' privacy.

98.     Plaintiff and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Google's actions, directed at injuring Plaintiff and Class members in conscious disregard of their rights. Such damages are needed to deter Google from engaging in such conduct in the future.

Plaintiff also seeks such other relief as the Court may deem just and proper.

**SECOND CLAIM FOR RELIEF**
**Violation of the California Constitution, Art. 1, § 1 – Invasion of Privacy**
**(On Behalf of Plaintiff and the Subclass)**

99.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

100.    Art. I, § 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

101.    The right to privacy in the California Constitution creates a private right of action against private and government entities. To state a claim for invasion of privacy under the California Constitution, a Plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

102.    Plaintiff and Class members have a legally protected privacy interest in their private communications with healthcare provider websites, such as Planned Parenthood's website, including information relating to their identities, pursuant to Art. I, § 1 of the California Constitution. Plaintiff's and Class members' private communications with the healthcare providers through the healthcare provider websites are inherently sensitive in nature, especially those relating to booking appointments.

103.    Plaintiff and Class members had a reasonable expectation of privacy under the circumstances, including that: (i) the private communications intercepted by Google include personal, sensitive information related to their health and Plaintiff's and Class members' identities; and (ii) Plaintiff and Class members did not consent or otherwise authorize Google to intercept, store, or use this private information for its own monetary gain.

104.    The private communications, which Google intruded upon and intercepted without Plaintiff's and Class members' authorization or consent, included extremely sensitive information like whether a user was pregnant and scheduled an abortion. Google's actions constituted an

egregious breach of the social norms, including because: (i) the data intercepted was highly sensitive and personal, as protected by the California Constitution; (ii) Google did not have authorization or consent to collect this information; and (iii) the invasion deprived Plaintiff and Class members the ability to control the circulation of said information, which is considered a fundamental right to privacy.

105.     Plaintiff and Class members have sustained damages and will continue to suffer damages as a direct and proximate result of Google's conduct, including an invasion of privacy.

106.     Plaintiff and Class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class members for the harm to their privacy interests as well as a disgorgement of profits made by Google as a result of its intrusions upon Plaintiff's and Class members' privacy.

107.     Plaintiff and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Google's actions, directed at injuring Plaintiff and Class members in conscious disregard of their rights. Such damages are needed to deter Google from engaging in such conduct in the future.

108.     Plaintiff also seeks such other relief as the Court may deem just and proper.

**THRID CLAIM FOR RELIEF**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**(Cal. Penal Code § 631 *et seq.*)**
**(On Behalf of the Plaintiff and Class and Subclass)**

109.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

110.     The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.* ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to

1    protect the right of privacy of the people of this state." *Id.*

2        111.    Cal. Penal Code § 631 imposes liability on any person who "by means of any

3    machine, instrument, or contrivance, or in any other manner" (1) "intentionally taps, or makes any

4    unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2)

5    "willfully and without the consent of all parties to the communication, or in any unauthorized

6    manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or

7    communication while the same is in transit or passing over any wire, line, or cable, or is being sent

8    from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any

9    manner, or for any purpose, or to communicate in any way, any information so obtained," or (4)

10   "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or

11   cause to be done any of the acts or things mentioned above in this section."

12       112.    Google is a person for purposes of § 631.

13       113.    Google maintains its principal places of business in California, where it designed,

14   contrived, agreed, conspired, effectuated, and/or received the interception and use of the contents of

15   Plaintiff's and Class members' sensitive communications. Additionally, Google has adopted

16   California substantive law to govern its relationship with users. Google intercepted Plaintiff's

17   confidential communications in California where she is located.

18       114.    Google's Tracking Technology, Plaintiff's and Class members' browsers, and

19   Plaintiff's and Class members' computing and mobile devices are a "machine, instrument, or

20   contrivance, or . . . other manner."

21       115.    At all relevant times, Google, using Google's Tracking Technology, intentionally

22   tapped or made unauthorized connections with the lines of internet communication between Plaintiff

23   and Class members and the healthcare providers without the consent of all parties to the

24   communication.

25       116.    Google, willfully and without the consent of Plaintiff and Class members, read or

26   attempted to read, or learned the contents or meaning of Plaintiff's and Class members' sensitive

27   communications to the healthcare providers while the communications were in transit or passing

28

over any wire, line or cable, or were being received at any place within California when it intercepted Plaintiff's and Class members' sensitive communications and data with the healthcare providers in real time.

117.    Google used or attempted to use the communications and information it received through Google's Tracking Technology, including to supply its analytics and advertising services and improve its technology.

118.    The interception of Plaintiff's and Class members' sensitive communications was without authorization and consent from the Plaintiff and Class members. Accordingly, the interception was unlawful and tortious.

119.    Plaintiff and the Class members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

120.    Plaintiff and Class members have also suffered irreparable injury from these unauthorized acts.  Plaintiff's and Class members' sensitive data has been collected, viewed, accessed, stored, by Google, has not been destroyed, and due to the continuing threat of such injury, Plaintiff and Class members have no adequate remedy at law. Plaintiff and Class members are entitled to injunctive relief.

**FOURTH CLAIM FOR RELIEF**
**Violation of CIPA**
**Cal. Penal Code § 632**
**(On Behalf of Plaintiff and Class and Subclass)**

121.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

122.    Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

123.   § 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

124.   Plaintiff's and Class members' communications to healthcare and medical providers through healthcare and medical provider websites, including their sensitive information such as information concerning reproductive health services and other medical information were confidential communications for purposes of § 632, including because Plaintiff and Class Members had an objectively reasonable expectation of privacy in this data.

125.   Plaintiff and Class members expected their communications to the healthcare providers through healthcare provider websites would not be intercepted by Google. Plaintiff and Class members did not expect Google to secretly eavesdrop upon or record this information and their communications.

126.   Google's Tracking Technology is an electronic amplifying or recording device for purposes of § 632.

127.   By contemporaneously intercepting and recording Plaintiff's and Class members' confidential communications to the healthcare providers through Google's Tracking Technology, Google eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

128.   At no time did Plaintiff or Class members consent to Google's conduct, nor could they reasonably expect that their communications to the healthcare providers through the healthcare provider websites, would be overheard or recorded by Google.

129.   Google utilized Plaintiff's and Class members' sensitive personal information for their own purposes, including advertising and analytics.

130.   Plaintiff and Class members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

131.    Plaintiff and Class members have also suffered irreparable injury from these unauthorized acts.  Plaintiff's and Class members' sensitive data has been collected, viewed, accessed, stored, by Google, has not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law. Plaintiff and Class members are entitled to injunctive relief.

**FIFTH CLAIM FOR RELIEF**
**Violation of CMIA**
**Cal. Civ. Code § 56.36**
**(On Behalf of Plaintiff and Class and Subclass)**

132.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

133.    Cal. Civ. Code § 56.36(B)(3)(A) prohibits any person of entity other than a licensed healthcare professional from knowingly or willfully obtaining medical information for financial gain.

134.    Cal. Civ. Code § 56.36(B)(5) prohibits any person or entity who is not permitted to receive medical information under the CMIA from knowingly and willfully obtaining, disclosing, or using the medical information without written authorization.

135.    The CMIA defines "medical information" to mean any "individually identifiable information" in possession of or derived from "a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment." The information the healthcare providers maintained and disclosed is medical information because it is identifiable information relating to a patient's medical condition, reproductive health, and subsequent plan of treatment.

136.    Accordingly, the healthcare providers are providers of health care under Cal. Civ. Code § 56.06, subdivisions (a) and (b), because the healthcare providers maintain medical information and offer software to consumers that is designed to maintain medical information for the purposes of allowing their users to manage their information or make the information available to a healthcare provider, or for the diagnoses, treatment, or management of a medical condition.

137.    The CMIA defines "patient" to mean any natural person, whether or not still living, who received health care services from a provider of health care and to whom medical information pertains.  Plaintiff is a living person who received health care services from a provider of health care, under § 56.06, and the medical information pertains to her specifically.

138.    Google is an entity who is not a licensed health care professional and is not permitted to receive medical information under the CMIA.

139.    Google violated Cal. Civ. Code § 56.36(B)(3)(A) and (B)(5) because it knowingly and willfully obtained medical information from the healthcare provider websites without authorization for its own financial gain.

140.    As described herein, Google intentionally designed Google's Tracking Technology to intercept data from the websites in which they are incorporated.

141.    Google knew Google's Tracking Technology was incorporated on the healthcare provider websites, including Planned Parenthood's website, and that it would consequently lead to the interception of medical information maintained by the healthcare providers.

142.    Google knowingly and willfully received this information without written authorization from Plaintiff and Class members, and did so for its own financial gain. Namely, to profit through advertising and analytics services it offers, as well as to improve its algorithms, data points, and other technologies.

143.    Pursuant to Cal. Civ. Code § 56.36(B)(3)(A) and Cal. Civ. Code § 56.36(B)(5), Google is liable for a civil penalty up to $250,000 per violation of these sections.

**SIXTH CLAIM FOR RELIEF**
**Aiding and Abetting Violation of CMIA**
**Cal. Civ. Code §§ 56.06, 56.101, 56.10**
**(On Behalf of Plaintiff and Class and Subclass)**

144.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

145.    Although not parties to this action, the healthcare providers disclosed Plaintiff's and Class members' medical information, which violated §§ 56.06, 56.101, and 56.10 of CMIA.  Google

is therefore subject to the same violations because it aided and abetted the healthcare providers in violating these sections.

146.    The healthcare providers violated Cal. Civ. Code § 56.06(e) because they did not maintain the confidentiality of users' medical information. The healthcare providers disclosed to Google, a third party, Plaintiff's and Class members' medical information without consent.

147.    The healthcare providers violated Cal. Civ. Code § 56.101, subdivision (a), because they failed to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information contained therein because they disclosed to Google Plaintiff's and Class members' medical information.

148.    The healthcare providers violated Cal. Civ. Code § 56.10, subdivision (a), because they disclosed medical information without first obtaining authorization when they disclosed to Google Plaintiff's and Class members' data, including medical information.

149.    By contracting with the healthcare providers to receive and use Plaintiff's and Class members' data and communications, including medical information, as well as providing the means to accomplish this objective, Google acted intentionally, or alternatively, with knowledge that the healthcare providers' misappropriation of Plaintiff's and Class members' medical information was a violation of the CMIA.

150.    Google provided substantial assistance and encouragement to healthcare providers' violation of the CMIA, including by providing the means, i.e., Google's Tracking Technology, to share and disclose this data. Google knew that its software could be seamlessly integrated without alerting users that their sensitive medical information would be shared with Google.

151.    Google's agreements with the healthcare providers and receipt of Plaintiff's and Class members' sensitive information, including medical information, are a substantial factor in causing the violations of the CMIA alleged herein. For example, in the absence of Google's software, the healthcare providers would likely not have shared Plaintiff's and Class members' medical information with Google.

152.     Given the lucrative value of Plaintiff's and Class members' medical information, Google was willing to receive, and encouraged, the healthcare providers to share this data. As a result, Google aided and abetted the healthcare providers' CMIA violations and is therefore liable for the relief sought by Plaintiff and the Class.

### SEVENTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(On Behalf of Plaintiff and Class and Subclass)**

153.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

154.     Google received benefits from Plaintiff and Class members and unjustly retained those benefits at their expense.

155.     Google received benefits from Plaintiff and Class members in the form of their highly valuable data, including health information pertaining to a user's health, including reproductive health, and seeking of medical treatment, that Google wrongfully intercepted from Plaintiff and Class members without authorization and proper compensation.

156.     Google intercepted, stored, and used this data for its own gain, providing Google with economic, intangible, and other benefits, including highly valuable data for analytics, advertising, and improvement of their platforms, algorithms, and advertising services.

157.     Had Plaintiff known of Google's misconduct, she would not have used the healthcare provider websites.

158.     Google unjustly retained these benefits at the expense of Plaintiff and Class members because Google's conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and Class members.

159.     The benefits that Google derived from Plaintiff and Class members rightly belong to Plaintiff and Class members. It would be inequitable under unjust enrichment principles in California and every other state for Google to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

160.    Google should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds that Google received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the proposed Classes, respectfully requests the Court enter an order:

a.    Certifying this case as a Class Action on behalf of the Classes defined above, appointing Plaintiff as the representative of the Classes, and appointing Plaintiff's counsel as the Class counsel;

b.    Declaring that Defendant's conduct, as set out above, violates the laws cited herein;

c.    Awarding damages, including nominal, statutory, and punitive damages where applicable, to Plaintiff and the Classes in an amount to be determined at trial;

d.    Awarding Plaintiff and the Classes their reasonable litigation expenses and attorneys' fees;

e.    Awarding Plaintiff and the Classes pre-and post-judgment interest, to the extent allowable;

f.    Awarding such other further injunctive and declaratory relief as is necessary to protect the interests of Plaintiff and the Classes; and

g.    Awarding such other and further relief as the Court deems reasonable and just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.


Dated: May 12, 2023                    */s/ Hal D. Cunningham*
                                       Hal D. Cunningham (Bar No. 243048)
                                       **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                       600 W. Broadway, Suite 3300
                                       San Diego, CA 92101
                                       Telephone: (619) 223-4565
                                       Facsimile: (619) 233-0508
                                       hcunningham@scott-scott.com

Christian Levis (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Joseph P. Guglielmo (*pro hac vice* forthcoming)
Carey Alexander (*pro hac vice* forthcoming)
230 Park Ave., 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com
calexander@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Erin Green Comite (*pro hac vice* forthcoming)
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
ecomite@scott-scott.com

*Attorneys for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT JURY TRIAL DEMANDED
CASE NO. _____